```
              UNITED STATES DISTRICT COURT
            EASTERN DISTRICT OF NORTH CAROLINA
                    WESTERN DIVISION
_____
                                 )
UNITED STATES OF AMERICA,        )
                                 )
                                 )   5:17-CR-00134-BR-1
          vs.                    )
                                 )
XAVIER EARQUHART,                )
              Defendant.         )
_____)
```

MARCH 26, 2018
JURY SELECTION and TRIAL TESTIMONY - DAY 1
BEFORE THE HONORABLE W. EARL BRITT
SENIOR UNITED STATES DISTRICT JUDGE

APPEARANCES:

On Behalf of the Government:

WILLIAM GILMORE, ASSISTANT U.S. ATTORNEY
U.S. Attorney's Office
New Bern Avenue, Suite 800
Raleigh, North Carolina  27601

On Behalf of the Defendant:

SUZANNE LITTLE, FEDERAL PUBLIC DEFENDER
Federal Public Defender's Office
150 Fayetteville Street, Suite 450
Raleigh, North Carolina  27601

ROSEMARY GODWIN
434 Fayetteville Street, Suite 2050
Raleigh, North Carolina  27601

AMY M. CONDON, CRR, RPR, CSR
Official Court Reporter
United States District Court
Raleigh, North Carolina
Stenotype with computer-aided transcription

I N D E X

GOVERNMENT'S WITNESSES

ANTHONY VENTRE

      Direct Examination by Mr. Gilmore        84

GOVERNMENT'S EXHIBITS

| NUMBER | RECEIVED |
|---|---|
| 1, A1, B, C1, D THROUGH H | 89 |
| D1, D8 through D11 and D13 | 102 |
| F1, F2, F6, F7 and F9 | 102 |
| G1, G2, G7 and G8 | 102 |
| 1.4, 1.6 and 1.7 | 131 |
| 1.5 | 128 |
| 1.9, 1.10, 2, 2.1 through 2.5 | 94 |
| 1.11 | 123 |
| 2.7, 3.2, 4.1, 6.4, 7.6, 8.1, 8.2 and 9.1 | 122 |
| 3, 3.1, 5, 5.1, and 4 | 95 |
| F3 through F5, F11 and F12 | 107 |
| G3 through G5, G13, G14, H2 through H4 and H7 | 107 |
| D4 through D6, D16, D17, E4 through E6, E12 and E13 | 107 |
| 6.1 through 6.3, 7, 7.1 through 7.4 | 95 |
| A9 through A12 | 95 |
| 9, C2, C7 through C9 and C11 | 102 |
| H9-H13, 9.2, B9, B10, D12, D14, D15 and D18 | 118 |
| G9-G12, G15, G16 | 118 |

GOVERNMENT'S EXHIBITS (Cont'd)

| | |
|---|---|
| C12, C13, 11, 11.1 - 11.3, E8 and E11 | 118 |
| 12, F8, F10-F13, F15, F16 | 118 |
| 14 | 87 |
| 15.4, 16.4, D5, C6, D7, B7 and G6 | 104 |
| 15.5, 15.6, 15.9 and 15.10 | 118 |
| 15.7, 15.11, 16.9, 16.4, 16.6, 16.19 and 16.20 | 126 |
| 16.5 through 16.8, 16.10 through 16.13, 16.17 and 16.18 | 118 |
| 109, 110, 113 and 114 | 111 |

1  an answer for you.

2          (Opening Statements filed under separate cover.)

3   (Opening Statements commencing at 2:51 p.m. and concluding at

4                          3:16 p.m.)

5          THE COURT:  You may call your first witness.

6          MR. GILMORE:  Your Honor, during the presentation of

7  the first witness, there is going to be a number of exhibits

8  that one located on carts here.  I would ask the Court

9  intermittently to have the agent come down and identify those

10 items of evidence, if it would please the Court.  I don't know

11 the Court's practice, but it's something that might aid the

12 jury in moving the case along.

13         THE COURT:  Are you talking about an agent who is

14 going to be a witness?

15         MR. GILMORE:  Yes, Your Honor.  Special Agent Tony

16 Ventre.

17         THE COURT:  He's going --

18         MR. GILMORE:  As he's testifying I would have him

19 come down periodically.

20         THE COURT:  It's not evidence you can present on your

21 monitor?

22         MR. GILMORE:  Once it's admitted we'll be able to

23 show it on the monitor, but where it comes from is a bigger

24 quantity of evidence which is shown here on the carts and we

25 have to identify it as authentic records, and then we're going

1  to admit a much smaller portion of the record.  So we'd like to

2  pull the carts up during that portion of the exam and have him

3  identify it and then take a seat again.

4      THE COURT:  Okay.

5      MR. GILMORE:  At this time the United States will

6  call Tony Ventre.

7      ANTHONY VENTRE,

8      having been duly sworn, testified as follows:

9      DIRECT EXAMINATION

10  BY MR. GILMORE:

11  Q.   Good afternoon.  Could you tell the jury please where you

12  work and what you do for a living.

13  A.   Yes.  I'm an employee with the Internal Revenue Service as

14  a criminal investigator.  I investigate criminal violations of

15  the tax code as well as other financial crimes, including money

16  laundering and the Bank Secrecy Act statutes.

17  Q.   Are you in a separate agency from the IRS where you would

18  pay your taxes?

19  A.   Yes.  We're a small portion of the IRS, for lack of a

20  better term, the police force.  We do have law enforcement

21  officer powers, including arrest, ability to execute warrants

22  and so forth.  We're not what you think about when you think

23  about getting audited by the IRS.

24  Q.   You investigate crimes?

25  A.   Correct.

## A. Ventre - Direct Examination

1  Q.   And how long have you been working there for IRS criminal

2  investigation?

3  A.   Almost 14 years.

4  Q.   During the course of your work with IRS criminal

5  investigation, did you become involved in an investigation of a

6  man named Xavier Milton Earquhart?

7  A.   I did.

8  Q.   Do you see Mr. Earquhart here in court today?

9  A.   Yes.  He's sitting over there in the purple shirt.

10         MR. GILMORE:  Your Honor, would the record reflect

11  that the witness identified the defendant.

12         THE COURT:  Let it so reflect.

13  BY MR. GILMORE:

14  Q.   Approximately, when was it -- tell the jury, if you could,

15  when it was you began investigating this case.

16  A.   Approximately three years ago.

17  Q.   How is it you became to be investigating the defendant?

18  A.   I was involved in another investigation where the target

19  of that investigation was -- we obtained bank surveillance

20  photographs of him in that branch.  In that branch was a

21  defendant receiving a large sum of cash from the other target.

22  Q.   Okay.  And how is it -- so you saw the defendant there,

23  and what did you do that led to this case?

24  A.   At the time we didn't know who he was so we began an

25  investigation to identify him.

A. Ventre - Direct Examination

1  Q.    All right.  And what in particular did you come to be

2  investigating as it pertains to this case?

3  A.    A number of real estate transactions.

4  Q.    All right.  And the charges against the defendant in this

5  case, do they relate to those transactions you investigated?

6  A.    They do.

7  Q.    What I'm going to do now -- do you have a series of

8  folders up there with you?

9  A.    Yes.

10  Q.    I'm going to direct your attention, if I could, to what is

11  marked as Government's Exhibit 14.  Do you recognize

12  Government's Exhibit 14?

13  A.    I do.

14  Q.    What is it?

15  A.    This is a summary chart which outlines the transactions in

16  the indictment.

17  Q.    Okay.  And the information that's contained within this

18  chart, is that drawn from other sources of information?

19  A.    Yes.  It comes from a number of sources, including real

20  estate records, register of deed offices, bank records and

21  interviews.

22  Q.    All right.  If we were to go through and examine each item

23  within that summary chart separately, would that be very

24  difficult to show here in court?

25  A.    The paper would be voluminous.

1          MR. GILMORE:  Your Honor, at this time the Government

2    would move to admit Exhibit 14 into the record.

3          THE COURT:  Admitted.

4        (Government's Exhibit No. 14 was admitted into evidence.)

5    BY MR. GILMORE:

6    Q.   On the screen I'm going to place Exhibit 14 on the screen

7    for your attention.  Could you, please, explain to the jury

8    what the chart shows as a whole and then I'll ask you some

9    detailed questions.

10   A.   As a whole it summarizes the charges in the indictment.

11   Q.   Go ahead.  Just focusing first on the top part of the

12   chart, what is that summarizing?

13   A.   Those are the first seven charges of the indictment,

14   series of bank fraud charges where we allege that 2732 Knowles

15   Street was acquired illegitimately and then used as collateral

16   for seven different loans.

17   Q.   Now focusing your attention on the bottom second of the

18   chart, those transactions in Row A through H, what does that

19   show the jury?

20   A.   Those are summaries of the second set of bank fraud

21   charges alleged in which the same pattern is followed

22   throughout.  A property is obtained in an HOA foreclosure

23   auction, the original owner had lost it for nonpayment of dues,

24   the property is deeded to a holding company and then sold for

25   profit.

1    Q.    All right.  And down here at the bottom right there's a

2    number -- there's one proceeds number and a bigger number.

3    What do those numbers represent?

4    A.    The first number, the 1,304,804.71 represents proceeds of

5    transactions A through H and the bigger number, $1,489,791.71

6    is the total proceeds of all accounts, all transactions.

7    Q.    What I want to do now is direct your attention to the

8    folder in front of you, should be in front of you containing

9    what are marked as Government Exhibit 1, A1, B, C1, D, E, F, G

10   and H.  Do you have those there?

11   A.    I do.

12   Q.    Outside of court, did you have an opportunity to

13   refamiliarize yourself with those exhibits?

14   A.    I did.

15   Q.    What are they as a whole?

16   A.    These are photographs of all the properties detailed in

17   the Exhibit 14.

18   Q.    How do you know that's what they are?

19   A.    I went to each location and took the photographs.

20        MR. GILMORE:  Your Honor, the Government would move

21   to admit each of those exhibits at this time.

22        THE COURT:  Admitted.

23     (Government's Exhibit Nos. 1, A1, B, C1, D through H were

24   admitted into evidence.)

25   BY MR. GILMORE:

1  Q.   I'm now going to place on the screen Exhibit 1 and

2  Exhibit 14.  Now, what is the jury seeing in Exhibit 1 as it

3  relates to Exhibit 14?

4  A.   Exhibit 1 is an actual photograph of 2730 Knowles Street;

5  that is the property that was used as collateral on the loan

6  applications in transactions one through seven.

7  Q.   You already described, I think, to the jury what it is you

8  investigated in Counts 1 through 7.  How did you learn of these

9  bank loan applications contained in Counts 1 through 7 shown

10 here?

11 A.   Through information obtained from various financial

12 institutions.  The ones listed under the lender column.

13 Q.   And when did -- you talked about when you began to

14 investigate this case.  When did these transactions occur in

15 relation to when you began your investigation?

16 A.   Prior to beginning the investigation.

17 Q.   Okay.  So these happened before you were involved?

18 A.   That's correct.

19 Q.   All right.  What, if anything, did you do to investigate

20 each of the bank loans that are represented in Counts 1 through

21 7?

22 A.   We subpoenaed records from each of the banks.

23 Q.   And when you say you subpoenaed records, tell the jury

24 what you mean by that.

25 A.   It's a document that demands production of records for the

1  Grand Jury.

2  Q.   Okay.  And do you retain those records once you receive

3  them?

4  A.   I do.

5  Q.   I'm now going to ask you -- looking to the lenders that

6  are referenced in Counts 1 through 7 there on the screen, did

7  you obtain loan applications and other documents from each of

8  those lenders?

9  A.   I did.

10  Q.   Okay.  Now, I'm going to ask you to identify a bunch of

11  exhibits that are on a cart down here.

12         MR. GILMORE:  Your Honor, may the witness step down

13  for just a moment to identify the record?

14         THE COURT:  Yes.

15  BY MR. GILMORE:

16  Q.   There in front of you do you have a series of exhibits

17  marked for identification as Government Exhibits 500, 500A,

18  501, 501A, 502, 502A, 503, 503A, 504, 504A, 505 and 505A?

19  A.   I do.

20  Q.   As a whole, what are each of those pairings of exhibits?

21  A.   The front page is just a straight number, is the

22  certification provided by the bank and the number with the A is

23  the records produced.

24  Q.   So you had the grouping of records produced by each of

25  those banks there?

1  A.    I do.

2  Q.    And we'll just have to go through and identify each one.

3  What are those represented by Exhibit 500?

4  A.    These are records produced by the State Employees Credit

5  Union.

6  Q.    What about 501A?

7  A.    Records produced by BB&T Bank.

8  Q.    502A?

9  A.    Records produced by Regions Bank.

10 Q.    503A?

11 A.    Records produced by TrustAtlantic Bank now known as First

12 Tennessee.

13 Q.    504A?

14 A.    Records produced by Sun Trust.

15 Q.    505A?

16 A.    Records produced by Capital Bank, also now known as First

17 Tennessee.

18 Q.    Now, were each of the records that you just identified

19 produced by a custodian of records for the bank?

20 A.    That's correct.

21 Q.    And what is that?  What is a custodian of records?

22 A.    Just what it sounds like.  They keep the records of the

23 bank.

24 Q.    And did a custodian of records for each of those banks

25 certify that the records were made near in time of the

1 occurrence in the matter set forth in the documents contained

2 in the folders there?

3 A.    Yes.   That's what the certification pages do.

4 Q.    Did the custodian certify that the records were kept in

5 the ordinary course of business?

6 A.    Yes.

7 Q.    And did the custodian certify that the records were made

8 by the regularly conducted activity as a regular practice of

9 the organization?

10 A.    Yes.

11 Q.    Okay.   Now, let me direct your attention to the green

12 folders sitting there in connection with each of those

13 groupings of exhibits.   The green folders.   What's contained

14 within each of the green folders that are sitting there?

15 A.    What's inside these green folders are copies of documents

16 that came from the entire universe of production.   They are

17 documents that are relevant to the transactions on Exhibit 14.

18 Q.    Okay.   So some of the things that you asked the bank to

19 produce don't relate to these charges?

20 A.    Exactly.

21 Q.    So what's in the green folders, again, relate specifically

22 to Exhibit 14?

23 A.    That's correct.

24 Q.    And outside of court, did you have an opportunity to

25 refamiliarize yourself with the contents of all those green

1  folders there?

2  A.   I have.

3  Q.   And are each of them true and correct copies from within

4  the bigger batch of production from the banks?

5  A.   They are.

6  Q.   All right.  Starting with the folder from State Employees

7  Credit Union, Exhibit 500A.  What are the records marked for

8  identification as Government Exhibit 1.9 and 1.10?

9  A.   These are records from State Employees Credit Union

10 relating to the charged accounts.

11 Q.   Moving to BB&T Exhibits 2, 2.1, 2.2, 2.3, 2.4, 2.5, A9,

12 A10, A11, and A12, what are those?

13 A.   Records from BB&T Bank relating to the chart.

14 Q.   Moving to the records from Regions Bank, what are Exhibits

15 3, 3.1, 5 and 5.1?

16 A.   These are records from Regions Bank relating to the

17 charged counts.

18 Q.   Moving on to First Tennessee Bank, is there a folder there

19 for First Tennessee Bank or TrustAtlantic Bank?

20 A.   Yes.

21 Q.   What are the records for?

22 A.   Records relating to TrustAtlantic relating back to the

23 summary chart.

24 Q.   What is 6.1, 6.2 and 6.3?

25 A.   These are records from Sun Trust, again, related to the

1  relevant counts.

2  Q.   Looking now to Exhibit 7, 7.1, 7.2, 7.3 and 7.4, what are

3  each of those?

4  A.   These are copies of records from Capital Bank that relate

5  back to the charged counts.

6  Q.   Thank you.

7       MR. GILMORE:  Your Honor, at this time the Government

8  would move to admit all of those exhibits I just referenced,

9  not the 500 series number or the 500A number, but the smaller

10 number digits, and I can repeat them if the Court requires.

11      THE COURT:  Repeat them for the record, please.

12      MR. GILMORE:  Certainly, Your Honor.  The Government

13 would move to admit Exhibit 1.9, 1.10, Exhibit 2, 2.1, 2.2,

14 2.3, 2.4, 2.5, A9, A10, A11, A12.

15      Also, Exhibits 3, 3.1, 5, 5.1.  Also, Exhibits 4,

16 Exhibit 6.1, 6.2, 6.3, Exhibit 7, 7.1, 7.2, 7.3, 7.4.

17      The Government would move to admit those at this

18 time.

19      THE COURT:  Let them be received.

20      (Government's Exhibit No. 1.9, 1.10, 2, 2.1 through 2.5

21 were admitted into evidence.)

22      (Government's Exhibit No. A9 through A12 were admitted

23 into evidence.)

24      (Government's Exhibit No. 3, 3.1, 5, 5.1 and 4 were

25 admitted into evidence.)

 1          (Government's Exhibit No. 6.1 through 6.3, 7, 7.1 through
 2     7.4 were admitted into evidence.)
 3     BY MR. GILMORE:
 4     Q.   All right.  I'm now going to direct your attention -- if
 5     you can have a seat for just a moment.
 6               THE COURT:  Just hand it back to the clerk.  She'll
 7     take care of it.
 8               THE WITNESS:  Thank you.
 9               MR. GILMORE:  We'll have to do that a few times, Your
10     Honor.
11               THE COURT:  Doesn't bother me.
12               MR. GILMORE:  Thank you, Your Honor.
13     BY MR. GILMORE:
14     Q.   All right.  I'll place Exhibit 14 back on the screen.  Let
15     me focus your attention on the bottom portion of the screen to
16     transactions listed in A through H.  Does that portion relate
17     to Counts 8, 9 and 10?
18     A.   They do.
19     Q.   And if you could just very briefly describe the pattern of
20     conduct that you were investigating with respect to those
21     counts.
22     A.   Yes.  In each transaction, the same pattern occurred.
23     Homeowner fell behind in their HOA dues and lost the house to
24     HOA foreclose.  From there, the property was auctioned off by
25     HOA and one deeded to the holding company listed on the chart.

1  From there, a fraudulent satisfaction document was recorded,

2  wiping away the mortgage, the property was then sold for

3  profit.

4  Q.   Okay.  So keeping Exhibit 14 on the screen, I'm now going

5  to add to the screen a series of exhibits and just ask you what

6  the jury is seeing in relation to Exhibit 14.  Starting with

7  Exhibit A1, what is A1?

8  A.   That is a home located at 1216 Cantlemere Street in Wake

9  Forest, North Carolina.

10  Q.   And is that the transaction shown in Row A?

11  A.   It is.

12  Q.   Moving on now to Exhibit B.  What is B?

13  A.   That relates to the Row B in the chart as the property

14  located at 2823 Wellington Ridge Loop in Cary, North Carolina.

15  Q.   And Exhibit C1?

16  A.   That's 505 E. 6th Street, Unit 1306, in Charlotte, North

17  Carolina.  It relates to Row C.

18  Q.   What is D?

19  A.   The condo located at 14716 Via Sorrento Drive in Charlotte

20  and relates to transaction D.

21  Q.   What is Exhibit E?

22  A.   That is a home located at 5213 Gable Ridge, Holly Springs,

23  North Carolina and relates to transaction E.

24  Q.   What is Exhibit F?

25  A.   A home located at 14109 Arbor Ridge Drive in Charlotte,

1  North Carolina and relates to transaction F.

2  Q.    What is Exhibit G?

3  A.    Exhibit G is the home located at 9007 Holland Park Lane in

4  Charlotte.  It relates to transaction G.

5  Q.    And what is Exhibit H?

6  A.    The home located at 4818 Swans Mill Drive in Durham.  It

7  relates to transaction H.

8  Q.    Now, let's just look at Exhibit 14 again, and what I would

9  ask you to do, not for all of the rows of the chart but just

10  for the first row, just explain to the jury what that row shows

11  with respect to that transaction.

12  A.    We'll use Row A as an example.  It shows the date of the

13  deed of the transaction, the property address, the original

14  owner of the property, the name of the holding company the

15  property was deeded to after being won at HOA foreclose

16  auction, and the name of the third-party buyer or purchaser of

17  the home from the holding company.

18  Q.    And with respect to the data that you just talked about in

19  each of those columns, where does all of that information come

20  from specifically -- where does it all come from?

21  A.    It came from a register of deed records.

22  Q.    Register of deed records?

23  A.    Yes.

24  Q.    Were there also bank records subpoenaed?

25  A.    Yes.

A. Ventre - Direct Examination

Q.   Do you have here in court the documents that you gathered
in connection with each of those transactions in Rows A through
H?

A.   I do.

Q.   All right.  Before I have you come down and identify
those, tell the jury, if you could, how it is that a person
gives a property over to someone else?  How do you transfer a
property?

A.   It's done with a piece of paper known as a deed.  What a
deed is, like I said, a piece of paper that's recorded in the
register of deeds office in the county the property is located.
It says, "I convey this property to John Doe on this date."  It
becomes a public record in the register of deeds for the entire
world to see.

Q.   So that's a deed.  If someone gets a mortgage on a house,
how does the bank put the world on notice that it has an
interest in that house?

A.   Also through paper, through a recorded document in the
register of deeds office known as a deed of trust puts the
world on notice that they have an interest in the property.

Q.   If the bank wants to tell the world that a mortgage has
been paid off, how do they do that?

A.   Once again, with paper.  This time they record a document
known as a satisfaction of security instrument which let's the
world know there is no more mortgage attached to the property.

1  Q.   And all of that is filed where?

2  A.   At the register of deeds office in the county the property

3  is located in.

4  Q.   Okay.  Is there one of those for pretty much every county

5  in the state?

6  A.   In all the states, yeah.

7  Q.   Okay.  So as part of your investigation, did you obtain

8  land records for each of the transactions shown in A through H?

9  A.   I have.

10  Q.   Now, I would ask you to -- I'm going to direct your

11  attention to the folders that are in front of you there marked

12  Wake, Franklin, Davidson, Durham, Mecklenburg.  Do you see

13  that?

14  A.   I do.

15  Q.   Outside of court, did you have an opportunity to

16  familiarize yourself with all the records contained in those

17  folders?

18  A.   I have.

19  Q.   What are they as a whole?

20  A.   These are documents produced by the register of deeds

21  office showing the -- showing the recordings related to these

22  transactions.

23  Q.   Okay.  And are each of those true -- each of those records

24  certified as being true and accurate copies of filings in each

25  of the respected register of deeds office?

1  A.    They are.

2  Q.    Do each of the records contain a seal reporting to be that

3  of the register of deeds office?

4  A.    They do.

5  Q.    Do the records contain matter to verify each register of

6  deeds office pursuant to duties imposed by law as to which they

7  have a duty to report?

8  A.    They do.

9  Q.    All right.  I direct your attention specifically, then, to

10 the folder containing exhibits -- I'm going to read them off --

11 1, 1.2, 1.3, 1.8, 2.6, 6, 7.5, 8, 100, 101, 102, 103, 104, 105,

12 106, B6, B7, B11, E1, E2, E3, E9, and E10.  Do you see those

13 there?

14 A.    I do.

15 Q.    What are those exhibits?

16 A.    These are certified copies of records from the Wake County

17 Register of Deeds.

18 Q.    Okay.  Directing your attention now to the folder

19 containing the following exhibits:  A2, A3, A5, A6, A7 and A8.

20 Do you see those there?

21 A.    I do.

22 Q.    What are those exhibits?

23 A.    These are records -- certified copies of records

24 maintained by the Franklin County Register of Deeds.

25 Q.    Are they all for transactions in Exhibit 14?

1    A.    Yes.

2    Q.    I direct your attention now to the folder containing A4.

3   What is A4?

4    A.    It is a certification of trust recorded by the Davidson

5   County Register of Deeds.

6    Q.    Does that relate to transactions in Exhibit F?

7    A.    Yes.

8    Q.    I'm sorry. Exhibit 14?

9    A.    Yes, Exhibit 14.

10    Q.    And I direct your attention specifically now to the folder

11   containing Exhibits H1, H5, H6, and H8. What are those

12   exhibits?

13    A.    These are certified copies of records maintained by the

14   Durham County Register of Deeds related to actually transaction

15   H.

16    Q.    All right. And I direct your attention now to the folder

17   containing the following exhibits: Exhibit 9, C2, C7, C8, C9,

18   C11, D1, D8, D9, D10, D11, D13, F1, F2, F6, F7, F9, G1, G2, G7

19   and G8. What are those exhibits?

20    A.    These are certified copies of records from the Mecklenburg

21   County Register of Deeds related to the transactions of the

22   properties located in Charlotte.

23    Q.    Lastly, let me direct your attention to the folder

24   containing -- it should also be there -- containing what are

25   marked as Government's Exhibits 8, 9, 10 and 13. Do you see

1  those there?

2  A.    I do.

3  Q.    What are those?

4  A.    True and accurate copies of relevant documents from these

5  folders.

6  Q.    And do each of those relate to Counts 8, 9, 10 and 13 of

7  the superseding indictment?

8  A.    They do.

9          MR. GILMORE:  Your Honor, at this time the Government

10  would move to admit each of those exhibits I just identified

11  and I can reread them if the Court desires.

12          THE COURT:  Let them be received.

13      (Government's Exhibit Nos. 9, C2, C7 through C9 and C11

14  were admitted into evidence.)

15      (Government's Exhibit Nos. D1, D8 through D11 and D13 were

16  admitted into evidence.)

17      (Government's Exhibit Nos. F1, F2, F6, F7 and F9 were

18  admitted into evidence.)

19      (Government's Exhibit Nos. G1, G2, G7 and G8 were admitted

20  into evidence.)

21  BY MR. GILMORE:

22  Q.    Exhibit 14 is still on the screen there for your attention

23  and the jury's.  I direct your attention now to the column

24  labeled "holding companies."  What is being referred to there

25  by "holding companies"?

1   A.    An entity that took possession of a property.

2   Q.    An entity that took possession of a property?

3   A.    Correct.

4   Q.    What type of entities were used in the transactions that

5   were reflected on this page?

6   A.    Trusts, corporations and LLCs.

7   Q.    And, for example, what type of entity was created for the

8   transaction shown in Row A?

9   A.    Trust.

10  Q.    What about Rows B through H?

11  A.    Either corporation or LLCs.

12  Q.    What, if anything, did you do to determine whether each of

13  these corporate names listed here were, in fact, real entities

14  created somewhere in the world?

15  A.    I searched them through the Delaware Secretary of State

16  web page.

17  Q.    How did you know to go to the Delaware Secretary of State?

18  A.    Many of the companies on the documents list the entity

19  name and says "a Delaware company."

20  Q.    And so looking to the -- I'm going to show you -- you

21  should have a folder in front of you marked for identification

22  or containing exhibits marked for identification containing

23  Exhibits 15.4, 16.4, D5, C6, D7, B7, G6.  What are they as a

24  whole?

25  A.    These are certified copies of the formation documents for

1  the Delaware companies listed in the chart.

2  Q.    And are all of these records certified as being true and

3  accurate by the Delaware Secretary of State?

4  A.    They are.

5  Q.    Do each of these contain a seal purporting to be that of a

6  Delaware Secretary of State?

7  A.    Yes, they do.

8  Q.    Do the records contain matters observed by the Secretary

9  of State pursuant to their duties imposed by law?

10 A.    Yes.

11         MR. GILMORE:  The Government would move to admit each

12 of the exhibits that I identified at this time.

13         THE COURT:  Admitted.

14     (Government's Exhibit Nos. 15.4, 16.4, D5, C6, D7, B7 and

15 G6 were admitted into evidence.)

16 BY MR. GILMORE:

17 Q.    What did you do to determine how these various Delaware

18 companies came into existence?

19 A.    While searching the Secretary of State web page to see if

20 the companies existed, you reference them back to the companies

21 to Harvard Business Services.

22 Q.    Tell the jury what that is.

23 A.    It's a company that specializes, or actually the business

24 model is to form Delaware companies and corporations for

25 others.

A. Ventre - Direct Examination

1  Q.    Do you have to -- actually have to go to Delaware to form
2  a company there?
3  A.    No.  It can be done online, through e-mail, through chat
4  or over the phone.
5  Q.    And does anyone have to actually see you or determine who
6  you, in fact, really are to form a company there?
7  A.    No, there's no verification of identity.
8  Q.    Did you serve a Grand Jury subpoena on Harvard Business
9  Services?
10 A.    I did.
11 Q.    What type of records did they produce?
12 A.    They gave us everything in their file, including contact
13 logs, e-mail chains, formation documents and client application
14 information.
15 Q.    All right.  If I can now direct your attention, I believe
16 it's on this cart back here, to Exhibit 506 -- 505 and 506 and
17 just ask you to identify that exhibit, please.
18         THE WITNESS:  May I step down?
19         THE COURT:  Sure.
20 BY MR. GILMORE:
21 Q.    What is Exhibit 505 and 506 -- I'm sorry.  506 and 506A?
22 A.    506 is a certification from Harvard Business Services for
23 these records and 506A are the actual records.
24 Q.    Were the records contained in that box there, 506A,
25 certified under oath by the custodian of records?

A. Ventre - Direct Examination

1   A.   They were.

2   Q.   Were they made according to that custodian at or near the

3   occurrence of the matter set forth in the documents there?

4   A.   Yes.

5   Q.   Did the custodian certify the records were kept in the

6   ordinary course of business?

7   A.   They did.

8   Q.   Did the custodian certify that the records were made by

9   the regularly conducted activity of the business as a regular

10  practice?

11  A.   Yes.

12  Q.   All of that is contained on the exhibit marked in 506, is

13  it not?

14  A.   Yes, right in front of the box.

15  Q.   All right.

16        MR. GILMORE:   The Government would move to --

17  BY MR. GILMORE:

18  Q.   Well, now I'd like to direct your attention to a series of

19  documents contained in the green folders there for Harvard

20  Business Services.  Do you see those?

21  A.   I do.

22  Q.   For the purposes of identification, I'm showing you 15,

23  15.1, 15.2, 15.3, 16, 16.1, 16.2 and 16.3.  Now directing your

24  attention to Exhibits B1, B2, B3, B8, B13, B14, Exhibits C3,

25  C4, C5-C6 14, C15, C16 --

A. Ventre - Direct Examination

```
 1              THE COURT:  Don't get too fast now.

 2              MR. GILMORE:  Thank you, Your Honor.

 3   BY MR. GILMORE:

 4   Q.   D4, D5, D6, D16, D17, E4, E5, E6, E12, E13, F3, F4, F5,

 5   F11, F12.  G3, G4, G5, G13, G14, H2, H3, H4, H7.

 6        Are each of those exhibits I just called out genuine

 7   copies of records contained within Exhibit 506A?

 8   A.   They are.

 9   Q.   Do each of those exhibits relate to the transactions

10   contained in Exhibit 14?

11   A.   They do.

12              MR. GILMORE:  The Government would move to admit each

13   of those exhibits at this time.

14              THE COURT:  Admitted.

15        (Government's Exhibit Nos. D4 - D6, D16, D17, E4 - E6, E12

16   and E13 were admitted into evidence.)

17        (Government's Exhibit Nos. F3 through F5, F11 and F12 were

18   admitted into evidence.)

19        (Government's Exhibit Nos. G3 through G, G13, G14, H2

20   through H4 and H7 were admitted into evidence.)

21   BY MR. GILMORE:

22   Q.   All right.  If you could take a seat for a moment, sir.

23        Looking back to Exhibit 14, were these transactions shown

24   here the only real estate transactions you investigated

25   involving the defendant?
```

1  A.    No.

2  Q.    What other types of transactions did you investigate?

3  A.    Transactions of a similar pattern that were not

4  successful.

5  Q.    Okay.  And specifically, did you investigate a transaction

6  for a property located at 928 Coral Bell in Wake Forest?

7  A.    I did.

8  Q.    What was the nature of that transaction?

9  A.    The transaction was, again -- it was being foreclosed by

10  the HOA.  The defendant, through a holding company, placed a

11  bid and won the bid and the property was placed in a holding

12  company.

13  Q.    What happened after the holding company retained title to

14  Coral Bell?

15  A.    The bank that held the mortgage came back and foreclosed

16  on the home.

17  Q.    How are they able to do that if the homeowner's

18  association had already foreclosed on the property and sold it

19  to the defendant's company?

20  A.    They held the deed of trust which gave them the right to

21  foreclose.

22  Q.    Was there litigation in Wake County over that foreclosure?

23  A.    Extensive litigation.

24  Q.    What, if any, documents did you obtain concerning that

25  litigation?

1  A.    The entire file of litigation.

2  Q.    All right.  In this series of exhibits either in front of

3  you or down here should be Exhibits 107 and 108.  Could you

4  please locate Exhibit 107 and 108 relating to the Wake County

5  litigation.

6  A.    Yes.

7  Q.    Do you recognize what's contained in Exhibits 107 and 108?

8  A.    Yes.  These are the two binders of records related to the

9  litigation of 928 Coral Bell.

10 Q.    Where did you get those?

11 A.    From the Wake County Superior Court's Office, Court Clerk.

12 Q.    Are those records contained there certified as being true

13 and accurate copies of the foreclosure proceeding concerning

14 928 Coral Bell?

15 A.    Yes.

16 Q.    And do each of the records contain a seal purporting to be

17 that of the Clerk of Court?

18 A.    They do.

19 Q.    And do the records contain matters observed -- I'm sorry.

20 Could you, just for the jury -- are those Superior Court

21 documents or are these register of deeds documents?

22 A.    They are Superior Court.

23 Q.    Okay.  And did the -- do they contain a seal of the

24 Superior Court?

25 A.    They do.

1   Q.   Do the records contain matters observed by the Superior

2   Court pursuant to duties imposed by law for which they have a

3   duty to report?

4   A.   Yes.

5   Q.   All right.  Now I'm going to direct you to Exhibits 109

6   through 114, which should be located there.  Directing your

7   attention specifically to those exhibits.  First to the

8   exhibits in front of -- relating to Exhibit 107, specifically

9   Exhibits 109 through 111.  What are Exhibits 109, 110 and 111?

10   A.   They are true and accurate copies of documents that are

11   contained in Exhibit 107.

12   Q.   And now looking to the exhibits in front of Exhibit 108 or

13   relating to Exhibit 108 identified as Exhibits 112 through 114,

14   what are those documents?

15   A.   True and accurate copies of documents contained in

16   Exhibit 108.

17   Q.   They relate to Coral Bell Drive as well?

18   A.   That's correct.

19         MR. GILMORE:  The Government moves to admit only

20   Exhibits 109, 110, 113 and 114.

21         THE COURT:  Admitted.

22     (Government's Exhibit Nos. 109, 110, 113 and 114 were

23   admitted into evidence.)

24   BY MR. GILMORE:

25   Q.   All right.  Placing your focus on Exhibit 14 at this

A. Ventre - Direct Examination

1  point --

2  A.   Would you like me to sit down?

3  Q.   Stay there for a moment.  The jurors have Exhibit 14 in

4  front of them, I believe.

5       Focusing, again, on the holding companies that you just

6  talked about.  You testified that the holding companies sold

7  the properties to third-party buyers in the chart, correct?

8  A.   That's correct.

9  Q.   How, if at all, were the holding companies paid for the

10  properties?

11  A.   I'm sorry.  How were they paid for?

12  Q.   Yes.  How were they paid?

13  A.   They received payment either through certified check or

14  wire transfer.

15  Q.   And did the holding companies have bank accounts?

16  A.   They did.

17  Q.   What, if anything, did you do to obtain those bank account

18  records?

19  A.   We issued a subpoena to each bank for the accounts.

20  Q.   Do you have those records here in court?

21  A.   I do.

22  Q.   I direct your attention now to the pairings of exhibits

23  that should be located in front of you that are marked for

24  identification as follows:  507, 507A, 508, 508A, 509, 509A,

25  510, 510A, 511, 511A, 511A, 512, 512A, 513, 513A, 514, 514A,

1    515, 515A, 517, 517A, 523A, 524 and 524A.

2         What are those pairings of exhibits?

3    A.   Those are the bank records with the certification on top

4    the number and the number with the A is the actual record

5    produced.

6    Q.   And were all of these records produced by a custodian for

7    each of the banks involved?

8    A.   Yes.

9    Q.   And did the custodian of records for each bank declare

10   under oath that the records were made near in time of the

11   occurrence of the matter set forth in the documents?

12   A.   Yes.

13   Q.   Transmitted by a person with knowledge of those documents?

14   A.   Yes.

15   Q.   Did the custodian certify that the records were kept in

16   the ordinary course of business?

17   A.   They did.

18   Q.   Did they certify that the records were made by the

19   regularly conducted activity of each bank?

20   A.   Yes.

21   Q.   And is all of that contained on the certificate you've

22   just been talking about?

23   A.   Yes.

24   Q.   In front of each of those banks, bank folders or bank

25   pairings, is there a green folder containing a smaller subset

1  of records?

2  A.    Yes.

3  Q.    Okay.  What are those records?

4  A.    These are true and accurate copies of documents

5  produced -- the documents relative to the transactions shown in

6  the summary chart in Exhibit 14.

7  Q.    So I'm going to have you identify them each by bank at

8  this point, if you could.  What are Exhibits C12 and C13, which

9  should relate to Exhibits 509 and 509A?  Starting with the

10 grouping of Exhibits 509 and 509A, what are C12 and C13?

11 A.    These documents -- copies of documents from Bank of

12 America.

13 Q.    Relating to what transaction or grouping?

14 A.    Related to the transaction with Lateef J & Sons Family

15 Condo, LLC.

16 Q.    Looking now to 510A, what is Exhibit 11?

17 A.    This is a second production or copies of a second

18 production from Bank of America relating to the same holding

19 company.

20 Q.    Okay.  Directing your attention to 511A, what are the

21 following Exhibits 11.1, 11.2, 11.3, F15, F16?

22 A.    I'm sorry.  Can you repeat that again?

23 Q.    So looking to the master Exhibit 511A, Bank of America

24 511A --

25 A.    Got it.

1  Q.    -- what are Exhibits 11.1, 11.2, 11.3, F15, and F16?

2  A.    These are copies of surveillance video stills provided by

3  Bank of America.

4  Q.    Relating to various transactions on Exhibit F14?

5  A.    Yes.

6  Q.    I'm sorry.  Exhibit 14.

7        What are -- looking now to master Exhibit 512A from Bank

8  of America, what are Exhibits E8 and E11?

9  A.    These are true and accurate copies of documents provided

10  by Bank of America related to the Gable Ridge property.

11  Q.    Now looking to Bank of America, Exhibit 513A, what is

12  Exhibit 12?

13  A.    This is additional production from Bank of America copies

14  of -- again, related to the Gable Ridge property.

15  Q.    Looking to Bank of America Exhibit 514A, what are Exhibits

16  F8 and F10?

17  A.    True and accurate copies of Bank of America documents

18  related to the 14109 Arbor Ridge Drive property.

19  Q.    Range all right.  Looking to Exhibit 515A from Bank of

20  America, what is F13?

21  A.    This is additional production from Bank of America for the

22  same company -- or for the same property, 14109 Arbor Ridge

23  Drive.

24  Q.    Looking to Exhibit 523A, if you could please tell the jury

25  what are Exhibits 15.5 -- I'll wait until you can find it.  So

1  master Exhibit 523A from Bank of America.  Do you have it

2  there?

3  A.   Yes.

4  Q.   Very good.  What are Exhibits 15.5, 15.6, 15.9, 15.10,

5  16.5, 16.6, 16.7, 16.8, 16.10, 16.11, 16.12, 16.13, 16.17,

6  16.18, H9, H10, H11, H12, H13, what are those records?

7  A.   These are copies of the production related to the Sidney

8  Hairston & Family Home Place, LLC, property of Bullion, LLC and

9  Xavier Earquhart, LLC accounts.

10  Q.   Looking to Bank of America Exhibit 524A.  Do you have that

11  there?

12  A.   Yes.

13  Q.   What is Exhibit 9.2?

14  A.   This is a copy of the mortgage payments made by Lateef

15  Johnson for the mortgage on 505 E. 6th Street in Charlotte.

16  Q.   Now, the jury at this point -- you've identified for them

17  various Bank of America productions; is that right?

18  A.   Yes.

19  Q.   Tell them why there is so many different pairings of

20  exhibits from Bank of America.

21  A.   We didn't know about all the accounts at once so we served

22  one subpoena.  As we learned about the accounts, we would issue

23  a subpoena for them.

24  Q.   You would get more and more over time?

25  A.   That's correct.

1  Q.    And they certified each of them?

2  A.    Yes.

3  Q.    Is there a folder there for Wells Fargo, Exhibit 507A?

4  A.    Yes.

5  Q.    What are exhibits marked as B9, B10 and B12?

6  A.    True copies of documents related to the Gun & Winter Elyse

7  Family Holding Company.

8  Q.    And looking to PNC Bank, Exhibit 508A, do you see that

9  there?

10  A.    Yes.

11         THE COURT:  Hold up a minute, Counselor.  Stay right

12  where you are.

13         Members of the jury, our schedule is sort of all

14  wacky today because of jury selection and we took our

15  afternoon -- we haven't taken an afternoon break.  We normally

16  would take it right about -- after an hour and a half, but

17  we'll be going home in 30 minutes.  So if you can get by

18  without a break, we can just go right on through and get out at

19  4:30.

20         Does anybody need a break?

21     (No hands raised.)

22         THE COURT:  Okay.  You may go on.

23         MR. GILMORE:  Thank you, Your Honor.

24  BY MR. GILMORE:

25  Q.    Can you identify exhibits from 508A marked as D12, D14,

1  D15 and D18?

2  A.    These are true and accurate copies of the PNC production

3  related to the Gaydos & Family 14716 Via Sorrento Condominium

4  account.

5  Q.    Now to 517A of PNC Bank.  What are Exhibits G9, G10, G11,

6  G15 and G16?

7  A.    True and accurate copies of documents produced by PNC

8  related to Keith H. Property, LLC account.

9  Q.    Thank you, sir.

10         MR. GILMORE:  Your Honor, at this time I'm going to

11 move to admit each of those exhibits, and I will read them out.

12         Special Agent Ventre, if you can take a seat, please.

13         The Government will be moving to admit at this time

14 Exhibits C12, C13, 11, 11.1, 11.2, 11.3, E8, E11, 12, F8, F10,

15 F13, F15, F16, 15.5, 15.6, 15.9, 15.10, 16.5, 16.6, 16.7, 16.8,

16 16.10, 16.11, 16.12, 16.13, 16.17, 16.18, H9, H10, H11, H12,

17 H13, 9.2, B9, B10, B12, D12, D14, D15, D18, G9, G10, G11, G12,

18 G15, and G16.

19         The Government moves to admit those exhibits at this

20 time.

21         THE COURT:  Admitted.

22     (Government's Exhibit Nos. C12, C13, 11, 11.1 through

23 11.3, E8 and E11 were admitted into evidence.)

24     (Government's Exhibit Nos. 12, F8, F10 through F13, F15

25 and F16 were admitted into evidence.)

1        (Government's Exhibit Nos. 15.5, 15.6, 15.9 and 15.10 were

2   admitted into evidence.)

3        (Government's Exhibit Nos. 16.5 through 16.8, 16.10

4   through 16.13, 16.17 and 16.18 were admitted into evidence.)

5        (Government's Exhibit Nos. H9 through H13, 9.2, B9, B10,

6   D12, D14, D15 and D18 were admitted into evidence.)

7        (Government's Exhibit Nos. G9 through G12, G15 and G16

8   were admitted into evidence.)

9   BY MR. GILMORE:

10  Q.   Now, sir, let me direct your attention to -- I believe

11  those are down here too, I apologize -- Government's exhibits

12  marked for identification as 522 and 522A, and the folder in

13  front of both of those containing exhibits -- if you could come

14  down and --

15            THE WITNESS:  May I step down?

16            THE COURT:  Sure.  Yes.

17  BY MR. GILMORE:

18  Q.   If you could locate 522 and 522A after you get the

19  microphone.

20  A.   Yes.

21  Q.   All right.  In front of that folder you should have what

22  are marked as Exhibits 11.4, 11.5, 12.1, 12.2, 12.3, 12.4, A13,

23  D19, D20, F14 and G17.  Do you see those there?

24  A.   Yes, I do.

25  Q.   What is Exhibit 522A?

1   A.    It's a certification from FINCEN.

2   Q.    Tell the jury, what is FINCEN?

3   A.    It's a government agency that collects data about bank

4   transactions, particularly currency transactions in excess of

5   $10,000, information on foreign bank accounts, among other

6   things.

7   Q.    What are currency transaction reports?

8   A.    A currency transaction report is a report that's required

9   to be filed by a financial institution or bank.  Any time a

10  currency in excess of $10,000 passes across the counter, be it

11  withdrawal or deposit, the bank is required to fill out this

12  form and file with FINCEN.

13  Q.    Why do banks have to file the CTR?

14  A.    It's an anti-money laundering device and required by law.

15  Q.    How do you use your CTR?

16  A.    It is common to acquire the database to find large

17  transactions or moving of funds into accounts.

18  Q.    How, if at all, did the CTRs assist you to determine the

19  identity of a person conducting a 10,000-dollar transaction?

20  A.    The conductor must provide identification to the bank so

21  their ID information will appear on the CTR.

22  Q.    And did you conduct an investigation looking to CTRs in

23  connection with your investigation of this case?

24  A.    I have.

25  Q.    And what CTRs did you gather?

## A. Ventre - Direct Examination

1  A.    Those are here in this folder, a number of CTRs related to

2  the defendant.

3  Q.    Okay.  And so what is Exhibit 522 as a whole, then?

4  A.    The production by FINCEN.

5  Q.    Are these records certified as being true and accurate

6  filings with FINCEN?

7  A.    Yes.

8  Q.    Do these records contain a seal purporting to be data of

9  FINCEN?

10  A.    Yes.

11  Q.    Do these records contain matters observed by FINCEN

12  pursuant to duties imposed by law which they have a duty to

13  report?

14  A.    Yes.

15  Q.    And those exhibits that are contained within the folder in

16  front there, 11.4, 11.5, 12.1, 12.2, 12.3, 12.4, 8, 13, D19,

17  D20, F14 and G17, what are those exhibits?

18  A.    These are true and accurate copies of CTRs produced by

19  FINCEN.

20  Q.    How did you use those exhibits specifically during the

21  course of this investigation?

22  A.    I used them to match up transactions by the defendant

23  either cashing checks or using bank accounts.

24  Q.    Okay.  Do you have there with you a folder with FDIC

25  documents in it?

A. Ventre - Direct Examination

1  A.   I do.

2  Q.   And in this case, sir, do you recall the defendant was

3  charged with bank frauds?

4  A.   Yes.

5  Q.   And frauds against financial institutions?

6  A.   Yes.

7  Q.   What are financial institutions as it pertains to this

8  case?

9  A.   They are one of three things:  Either an entity that

10 originates mortgages, an entity that is insured by the Federal

11 Deposit -- deposits insured by the Federal Deposit Insured

12 Corporation or in the case of a credit union, has their

13 deposits insured by the National Credit Union Insurance Fund,

14 Shared Insurance fund.

15 Q.   Is it like the FDIC for state for credit unions?

16 A.   In layman's terms, yes.

17 Q.   What, if anything, did you do in the investigation to

18 confirm that the banks and lenders were, in fact, financial

19 institutions as you just described them?

20 A.   Having them certified by FDIC and National Credit Union

21 Association that they were.

22 Q.   Okay.  So looking to Exhibits 2.7, 3.2, 4.1, 6.4, 7.6,

23 8.1, 8.2 and 9.1, what are those documents?

24 A.   These are the certifications by the FDIC.

25 Q.   And they relate to the transactions in Exhibit 14?

1   A.   Correct.

2   Q.   Did the custodian of records for FDIC certify that -- the

3   records were made at or near the time of the occurrence of the

4   matter set forth in the documents of information transmitted by

5   a person with knowledge?

6   A.   Yes.

7   Q.   Did the custodian certify that the records were kept in

8   the ordinary course of business?

9   A.   Yes.

10  Q.   And that the records were made by the regularly conducted

11  activity as a regular practice?

12  A.   Yes.

13          MR. GILMORE:  The Government would move at this time

14  to admit Exhibits 2.7, 3.2, 4.1, 6.4, 7.6, 8.1, 8.2 and 9.1

15  into the record.

16          THE COURT:  Admitted.

17      (Government's Exhibit Nos. 2.7, 3.2, 4.1, 6.4, 7.6, 8.1,

18  8.2 and 9.1 were admitted into evidence.)

19  BY MR. GILMORE:

20  Q.   Now directing your attention to what is Government's

21  Exhibit 1.1.  Should be with that grouping of exhibits.  What

22  is 1.1 -- I'm sorry -- 1.11?

23  A.   That is a certification by the National Credit Union

24  Association.

25  Q.   And was that document produced by a custodian of records

1  for that entity?

2  A.   Yes.

3  Q.   And did they certify that the records were made at or near

4  the time of the occurrence of the matter set forth in the

5  documents from information transmitted by a person with

6  knowledge?

7  A.   They did.

8  Q.   And did the custodian for NCUA certify that the records

9  were kept in the ordinary course of business?

10 A.   Yes.

11 Q.   Did the custodian certify that the records were made as a

12 regular activity as a regular practice of the NCUA?

13 A.   Yes.

14       MR. GILMORE:  The Government moves to admit

15 Exhibit 1.11 at this time.

16       THE COURT:  Admitted.

17    (Government's Exhibit No. 1.11 was admitted into

18 evidence.)

19 BY MR. GILMORE:

20 Q.   All right.  You can take a seat, sir.

21    Now looking back to Exhibit 14 again.  Did you conduct an

22 analysis to determine -- looking over at the right side of the

23 screen, the proceeds column.  Did you conduct an analysis to

24 determine how the proceeds of those transactions were spent?

25 A.   I did.

1  Q.    Did you obtain records concerning those expenditures?

2  A.    Yes.

3  Q.    I direct your attention now to what are marked -- should

4  be in front of you.  What are marked as Government Exhibits

5  15 -- maybe they are not.  They may be down here on the cart,

6  if you can come find them.  Records for Westlake Pro, J and

7  Bullion and Apmex.

8        What are the pairings of the Exhibits 518 and 518A?

9  A.    Certification documents produced by Westlake Pro.

10 Q.    What kind of company is that?

11 A.    That is a retailer of high end studio and recording

12 equipment, mixing boards, speakers and that kind of stuff.

13 Q.    What are Exhibits 519 and 519A?

14 A.    Production by J. Bullion, Inc.

15 Q.    What kind of company is that?

16 A.    That is a seller of precious metals.

17 Q.    What are Exhibits 520 and 520A?

18 A.    Those are records produced by Apmex, Inc.

19 Q.    What kind of company is Apmex, Inc.?

20 A.    Another company that deals with precious metals.

21 Q.    Were all the records produced for each of those companies

22 there produced by a custodian of record for the businesses?

23 A.    They were.

24 Q.    I'm going to ask you the same set of questions.  Did the

25 custodian of records declare under oath that the records were

1  made at or near the time of the occurrence of the matter set

2  forth in the documents and transmitted by a person with

3  knowledge?

4  A.   Yes.

5  Q.   Did the custodian of the records certify that the records

6  were kept in the ordinary course of business?

7  A.   Yes.

8  Q.   Did the custodian certify that they were made by the

9  regularly conducted activity as a regular practice?

10  A.   Yes.

11  Q.   Is all that contained on the certificate there for each

12  entity?

13  A.   It is.

14  Q.   The Government will now direct your attention to the

15  exhibits from within each of those productions.  Starting with

16  518A, Exhibits 15.7, 15.11, what are those?

17  A.   These are invoices for the studio equipment from Westlake

18  Pro.

19  Q.   Looking to the J. Bullion folder, what is Exhibit 16.9?

20  A.   An order from J. Bullion.

21  Q.   And looking to the Apmex folder, 520, what are Exhibits

22  16.4, 16.5, 16.6, 16.19 and 16.20?

23  A.   Accounting documents and invoices from Apmex.

24  Q.   Are each of those documents that you just identified true

25  and correct copies from within the certified record production?

1  A.   Yes.

2        MR. GILMORE:  The Government would move to admit at

3  this time Exhibits 15.7, 15.11, 16.9, 16.4, 16.6, 16.19 and

4  16.20.

5        THE COURT:  Admitted.

6     (Government's Exhibit Nos. 15.7, 15.11, 16.9, 16.4, 16.6,

7  16.19 and 16.20 were admitted into evidence.)

8        MR. GILMORE:  You can take a seat, sir.

9  BY MR. GILMORE:

10 Q.   All right.  Special Agent Ventre, through the course of

11 your investigation of this case, did you discover that any P.O.

12 Boxes were utilized?

13 A.   Yes.

14 Q.   And did you see any one Post Office Box used more than

15 others?

16 A.   Yes.  There's a P.O. Box, Box 1090 in Zebulon, North

17 Carolina.

18 Q.   And what, if anything, did you do to determine who used or

19 controlled that P.O. Box?

20 A.   I contacted the Postal Inspection Service, who were able

21 to give me a copy of the application.

22 Q.   Copy of the application?

23 A.   Yes.

24 Q.   Okay.  I show you what's marked -- should be in front of

25 you in a folder marked as Exhibit 1.5 for identification.  What

1  is Exhibit 1.5?

2  A.   This is the certified copy of the application for Box 1090

3  in Zebulon.

4  Q.   Was this post office box record produced by a custodian of

5  the post office?

6  A.   Yes.

7  Q.   Did the custodian certify that the records were made at or

8  near the time of the occurrence of the matter set forth by or

9  from information transmitted by a person with knowledge of

10  those matters?

11  A.   Yes.

12  Q.   Did the custodian certify the records were kept in the

13  ordinary course of business?

14  A.   Yes.

15  Q.   Did the custodian certify the records were made by the

16  regularly conducted activity as a regular practice of the post

17  office?

18  A.   Yes.

19         MR. GILMORE:   Government moves to admit Exhibit 1.5

20  at this time.

21         THE COURT:   Admitted.

22      (Government's Exhibit No. 1.5 was admitted into evidence.)

23  BY MR. GILMORE:

24  Q.   On the screen for the jury's attention I'm going to place

25  Exhibit 1.5.  Do you see in the upper right-hand part of the

1    screen where it says, "Box 1090"?

2    A.    I do.

3    Q.    Upper right-hand part of the screen here.

4         Looking down here to the name of business, and it's number

5    two, name of business organization, could you please read into

6    the record what is written there?

7    A.    Three names written:  First is AAAA House Moving, the

8    second is Asset Management Net Worth and the third is Xavier

9    Earquhart.

10   Q.    All right.  Now, let's move down to box eight.  Do you see

11   where this says, "Applicant must select and enter the ID number

12   for two items of valid identification listed below.  You must

13   present the IDs at a post office.  One item must contain a

14   photograph and one must be traceable to the bearer to prove

15   your physical address.  Both must be current."

16        What form of photo ID is checked off on this form?

17   A.    Valid driver's license or state non-driver's ID card.

18   Q.    And looking down to photo ID number, what number is listed

19   there?

20   A.    25392117.

21   Q.    What number is that?

22   A.    That is the North Carolina driver's license number of the

23   defendant.

24   Q.    In looking to the -- we're going to go down now to the

25   customer initials shown on this same exhibit.  What initials

A. Ventre - Direct Examination

1  are shown there on the post office box application?

2  A.   XE.

3  Q.   Looking down at the signature at the bottom of this

4  document.  During the course of the investigation, did you see

5  markings like this associated with any particular names?

6  A.   Yes.

7  Q.   What names is that?

8  A.   The defendant.

9       Xavier Earquhart.

10 Q.   And moving over to the right-hand side of the screen to

11 the stamp that's there under Zebulon MPO, what date is shown

12 there?

13 A.   May 29, 2014.

14 Q.   All right.  Moving back to the top of the document, let me

15 direct your attention back to that line showing the business

16 names.  Looking first to that business AAAA House Moving and

17 then Asset Management Net Worth.  Did you do anything to

18 investigate who created those entities?

19 A.   Yes, I did.

20 Q.   I direct your attention to the folder, should be in front

21 of you, containing exhibits marked for identification as

22 Government Exhibits 1.4, 1.6 and 1.7.  Do you recognize those

23 exhibits?

24 A.   I do.

25 Q.   What are they?

1   A.    These are certified copies of recordings by North Carolina

2   Department of Secretary of State.

3   Q.    And looking first to 1.4, what company is it that's formed

4   in that document?

5   A.    I'm sorry.  You said 1.4?

6   Q.    Yes, sir.  1.4.

7   A.    Executive Investment Group, Inc.

8   Q.    And looking to 1.6?

9   A.    Asset Management and Net Worth Holdings, LLC.

10  Q.    Now 1.7?

11  A.    AAAA Structural House Movers, LLC.

12  Q.    And you obtained those from the North Carolina Secretary

13  of State?

14  A.    Yes.

15  Q.    Did those contain a seal purporting to be that of the

16  North Carolina Secretary of State?

17  A.    Yes.

18  Q.    Do the records contain matters considered by the North

19  Carolina Secretary of State pursuant to duties imposed by law

20  as to which they have a duty to report?

21  A.    Yes.

22          MR. GILMORE:  The Government would move to admit

23  Exhibits 1.4, 1.6 and 1.7 at this time.

24          THE COURT:  Admitted.

25      (Government's Exhibit Nos. 1.4, 1.6 and 1.7 were admitted

A. Ventre - Direct Examination

1    into evidence.)

2    BY MR. GILMORE:

3    Q.   Let's focus your attention on the company listed on the

4    post office box application, Asset Management and Net Worth.

5    I'm going to place on the screen Exhibit 1.6.  All right.  Do

6    you see where this says, "Articles of organization of Asset

7    Management and Net Worth Holdings, LLC"?

8    A.   I do.

9    Q.   What are articles of organization?

10   A.   The formation of the company.

11   Q.   Okay.  Where do you have to file those?

12   A.   In the Secretary of State office.

13   Q.   And once you file those articles of organization, what

14   does that allow you to do?

15   A.   To conduct business as a company.

16   Q.   Okay.  So I'm going to go to page 2 of this document.  Who

17   is listed under number three as the person executing the

18   articles of organization?

19   A.   Xavier Earquhart as organizer.

20   Q.   Is that a slightly altered spelling of the defendant's

21   name?

22   A.   It is.

23   Q.   Who is listed as the initial registered agent for this

24   company?  It's down -- one number down.

25        Who is listed as the initial registered agent for the

1    company?

2    A.    Executive Investment Group, Inc.

3    Q.    All right.  Now, moving past that to the last page of this

4    document, in looking underneath the date September 27, 2013,

5    who purports to sign this document as the organizer?

6    A.    Xavier Earquhart.

7    Q.    Moving your attention now to the company AAAA House Moving

8    listed on the post office box application, I'm going to place

9    on the screen Exhibit 1.7.  Do you see where this says,

10   "Articles of organization, AAAA Structural House Movers, LLC"?

11   A.    I do.

12   Q.    Let's go to page 2.  Who is listed under number three as

13   the person executing the articles of organization both as

14   organizer and member?

15   A.    Xavier Earquhart.

16   Q.    Again, is that a slightly altered spelling of the

17   defendant's name?

18   A.    Yes.

19   Q.    Who is listed as the initial registered agent for this

20   company?

21   A.    Asset Management and Net Worth Holding, LLC.

22   Q.    Moving to the last page of this exhibit and looking

23   beneath the date September 28th, 2013, who purports to sign

24   this document as organizer and member?

25   A.    Xavier Earquhart.

1    Q.    Lastly, I'm going to place Exhibit 1.4 on the screen.    Do

2    you see where this says, "Articles of incorporation of

3    Executive Investment Group, Inc."?

4    A.    I do.

5    Q.    And do you see the date filed there, October 13, 2010?

6    A.    I do.

7    Q.    Going to page 2, under the mailing address for Executive

8    Investment Group, the mailing address, what address is listed

9    there?

10   A.    P.O. Box 1090, Zebulon, North Carolina 27597.

11   Q.    Is that the defendant's post office box?

12   A.    Yes.

13   Q.    Who is the registered agent listed there?

14   A.    Xavier Smart.

15   Q.    Who is Xavier Smart?

16   A.    The defendant.

17   Q.    That's not his name today, though?

18   A.    No.    That was his name at birth.

19   Q.    He changed his name?

20   A.    Yeah, some time ago.

21   Q.    And how do you know that?

22   A.    I reviewed documents in the register of deeds office.    I

23   also listened to a deposition from bankruptcy proceedings which

24   he admitted as such.

25   Q.    So moving on to page 3 of the same document, what name is

1  listed as the signer on this document?

2  A.    Xavier Smart.

3  Q.    And what P.O. Box is listed here on this document for this

4  Executive Investment Group?

5  A.    Again, P.O. Box 1090, Zebulon, North Carolina.

6  Q.    Now, with respect to this entity created by the defendant,

7  Executive Investment Group, how, if at all, is that entity

8  involved in Counts 1 through 7?

9  A.    That is a holding company that took possession of 2732

10  Knowles Street before it was conveyed to the defendant.

11  Q.    All right.  I'm going to direct your attention, then, to

12  that series of counts, 1 through 7, and I'm going to place on

13  the screen Exhibit 1 and Exhibit 1.1 at page 2.

14      What is the jury seeing here in Exhibits 1 and 1.1?

15  A.    Exhibit 1 is the property located at 2732 Knowles Street.

16  Exhibit 1.1, can you zoom in on that?

17  Q.    Yes, sure.

18          THE COURT:  You mean Exhibit 1 is a photograph?

19          THE WITNESS:  I'm sorry.  The photograph of the

20  property.

21  BY MR. GILMORE:

22  Q.    So we zoomed in on Exhibit 1.1.  What is the jury seeing

23  in 1.1?

24  A.    This is showing where the property at 2732 Knowles Street

25  was conveyed to Marie Guerda Dominique.

1  Q.   Let's see if we can zoom in to the language in the first

2  paragraph of Exhibit 1.1.  Let's zoom in on the opening

3  language.  Do you see where it says, This deed made the 2nd day

4  of 1993, between C. Edward Alexander, II, substitute trustee,

5  the deed of trust, grantor; and then Marie Guerda Dominique as

6  the grantee, do you see that?

7  A.   Yes.

8  Q.   What does this document purport to show happened with

9  respect to Knowles Street back in 1993?  What happened in this

10  document?

11  A.   Ms. Dominique took deed of trust property.

12  Q.   She took ownership of the property?

13  A.   She took ownership of the property, yes.

14       THE COURT:  You said "deed of trust," is that what

15  you meant?

16       THE WITNESS:  The property was conveyed to Ms. Guerda

17  Dominique.

18  BY MR. GILMORE:

19  Q.   Is this a deed?

20  A.   Can you zoom?  Yes.  It says "this deed."

21  Q.   Okay.  So is this where she takes ownership of the

22  property?

23  A.   Yes.

24  Q.   Now I'm going to place on the screen -- keeping Exhibit 1,

25  I'm going to place Exhibit 1.2 on the screen.  And I'm going to

1  go to page 2.  All right.

2      Now, zooming in on Exhibit 1.2 a little bit, do you see

3  where 1.2 states, North Carolina General Warranty Deed, 26th

4  day of November, 2010; grantor, Marie Guerda Dominique; and

5  grantee, Abraham Elijah Ishmael.  Do you see that?

6  A.   I do.

7  Q.   What does this document purport to do with respect to

8  ownership of Knowles Street?

9  A.   It conveys 2732 Knowles Street from Ms. Marie Guerda

10 Dominique to Abraham Elijah Ishmael.

11 Q.   What, if anything, did you do to determine whether that

12 person here, Abraham Elijah Ishmael, whether that was a real

13 person?

14 A.   I searched a number of databases.

15 Q.   Did you ever find him?

16 A.   I could not find an Abraham Elijah Ishmael.

17 Q.   Going to page 3 of the same exhibit, and zooming in, if

18 you could, on the -- this portion right here that shows a

19 signature.  Do you see that?  Is that supposed to be the

20 signature of Ms. Guerda Dominique?

21 A.   Yes.

22 Q.   And now, if we can look down to the notary section of this

23 deed.  Do you see Jorge Cruz listed as the notary in Wake

24 County, North Carolina?

25 A.   I do.

## A. Ventre - Direct Examination

1  Q.   What is the purpose of a notary?

2  A.   Notary is an agent of the state.  They certify that the

3  person that appeared before them and signed the document is, in

4  fact, that person by checking ID and then notarizing the

5  document by putting their stamp and signing it themselves.

6  Q.   Okay.  So Jorge Cruz, did you talk to Mr. Cruz?

7  A.   Yes, I did.

8  Q.   And will the jury hear from Mr. Cruz about whether Ishmael

9  or a Marie Dominique ever appeared in front of him?

10  A.   Yes, they will.

11  Q.   Okay.  Now I'm going to place Exhibit 1 and 1.3 on the

12  screen.

13      Going to page 2 of Exhibit 1.3 and zooming in, do you see

14  where this document states, North Carolina General Warranty

15  Deed 1st day of February, 2011; grantor, Abraham Elijah

16  Ishmael; grantee, Executive Investment Group.  Do you see that?

17  A.   I do.

18  Q.   What does this document purport to do with respect to

19  ownership of Knowles Street?

20  A.   It conveys the Knowles Street property from Abraham Elijah

21  Ishmael to Executive Investment Group.

22  Q.   What P.O. Box is listed on this document?

23  A.   P.O. Box 1090 Zebulon, North Carolina.

24  Q.   Whose P.O. Box is that?

25  A.   The defendant's.

1 Q.   Going to page 3 of this document, who is supposed to have
2 signed this document that I'm circling here on page 3?
3 A.   Abraham Elijah Ishmael.
4 Q.   And who is that person, Abraham Elijah Ishmael, supposed
5 to have appeared in front of and signed that document?
6 A.   The notary, Jorge Cruz.
7 Q.   Okay.  And again, the jury will hear from Mr. Cruz?
8 A.   Yes.
9 Q.   I'm going to place on the screen Exhibit 1 and 1.8.  Going
10 to page 2 of 1.8 and zooming in, do you see where this states,
11 North Carolina General Warranty Deed, 22nd day of March, 2013;
12 grantor, Executive Investment Group; grantee, Xavier Earquhart,
13 P.O. Box 1090, Zebulon, North Carolina?
14 A.   I do.
15 Q.   What does this document purport to do with respect to
16 ownership of Knowles Street?
17 A.   It conveys the property of Executive Investment Group,
18 Inc. to the defendant.
19 Q.   All right.  So now I'm going to place Exhibit 14 back on
20 the screen.
21          THE COURT:  No, you're not.  It's time to go home.
22          Members of the jury, if we didn't take a recess back
23 then, we'll take it at 4:30, and that is what we're going to
24 do.  And that is going to be our regular schedule for the most
25 part, unless I change it and tell you about it in advance.

 1          We'll start at 9:00 o'clock in the morning, we'll

 2     take a one-and-one-half hour recess at 12:30 to 2:00 and we'll

 3     recess for the day at 4:30.  So you will know and plan your

 4     schedule and things of that nature.

 5          So I would ask you to please be back tomorrow morning

 6     sufficiently before 9:00 o'clock so that we can start promptly

 7     at that time.

 8          You got to remember there is 14 of you.  If one of

 9     you is five minutes late, that's a bunch of time of a lot of

10     people wasted, in addition to the courtroom people.  So please

11     be here on schedule.  And if you'll come on time, I promise you

12     I'll let you out on time.

13          And during the overnight recess, please don't discuss

14     the case with anyone or allow anyone to discuss it with you.

15     Don't do any research about it.  Wait until you come back here

16     tomorrow morning and we'll get -- Mr. U.S. Attorney is putting

17     his case on in a rapid fashion, so we're moving along.

18          Leave your notepads in your seat or give them to

19     Lauren on your way out and we'll take care of them overnight

20     and give them back to you tomorrow morning.

21          Everyone else remain seated as the jury leaves the

22     courtroom.

23        (The jury exited the courtroom at 4:31 p.m.)

24          THE COURT:  Mr. Gilmore, if you want to leave that

25     stuff in here, I'll order the Marshal Service to secure the

1  courtroom and you can leave it right there, if you want to.

2          MR. GILMORE:  Your Honor, more -- I think we're done

3  with the document admissions so the custodial exhibits will all

4  go back with the Government.  The ones we've admitted we can

5  give to the clerk at this time.

6          THE COURT:  Okay.

7          MR. GILMORE:  Very good.

8          THE COURT:  I'm trying to help you.  You're moving,

9  doing real well.

10          MR. GILMORE:  Thank you, Your Honor.

11          THE COURT:  All right.  Remember, if you need to see

12  me in the morning before court starts, please let Lauren know

13  and she'll let me know and I'll come in before the jury.

14          I hope all of you have a good overnight recess, which

15  we will now take until tomorrow morning at 9:00 o'clock.

16          (The proceedings were recessed at 4:33 p.m.)

17

18                      *      *      *

19

20

21

22

23

24

25

1                    UNITED STATE DISTRICT COURT

2                  EASTERN DISTRICT OF NORTH CAROLINA

3

4

5                   CERTIFICATE OF OFFICIAL REPORTER

6

7   I, Amy M. Condon, CRR, RPR, CSR, Federal Official Court

8   Reporter, in and for the United States District Court for the

9   Eastern District of North Carolina, do hereby certify that

10  pursuant to Section 753, Title 28, United States Code, that the

11  foregoing is a true and correct transcript of the

12  stenographically reported proceedings held in the

13  above-entitled matter and that the transcript page format is in

14  conformance with the regulations of the Judicial Conference of

15  the United States.

16

17

18  Dated this 5th day of October, 2018.

19

20                                  /s/ Amy M. Condon
21                                  Amy M. Condon, CRR, CSR, RPR
                                    U.S. Official Court Reporter
22

23

24

25